UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JOSEPH DeLONG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | CIVIL ACTION |
| | ) | NO. 17-11783-PBS |
| BART NELSON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**REPORT AND RECOMMENDATION ON
DEFENDANTS' MOTIONS TO DISMISS**

August 7, 2019

DEIN, U.S.M.J.

*Pro se* plaintiff Joseph DeLong, a state prisoner, filed a complaint pursuant to 42 U.S.C.

§ 1983, alleging that various medical providers and correctional staff provided negligent care

and have been deliberately indifferent to his serious medical needs in the wake of an injury he

sustained at the Souza Baranowski Correctional Center.  The plaintiff's Amended Complaint

(Docket No. 57) ("Am. Compl.") alleges violations of federal constitutional and state law against

fourteen defendants.

After filing the instant suit, the plaintiff moved for a temporary restraining order and a

preliminary injunction.  (See Docket No. 74).  Both motions were denied.  (Docket Nos. 76, 164).

The plaintiff's medical malpractice claims against Defendants Khiem Tran and Adriana Carrillo

were transferred to the Massachusetts Superior Court Medical Malpractice Tribunal.  (Docket

Nos. 94, 116).  The Tribunal found in favor of Defendant Tran.  (Docket No. 159).  DeLong

subsequently moved to set aside the Tribunal's decision as to Defendant Tran, and that motion remains pending before the court.  (See Docket No. 182).  He has been granted until August 30, 2019 to submit all evidence, if any, to support his claim concerning his medical records. (Docket Nos. 184, 189).  The Medical Malpractice Tribunal has not yet issued a decision regarding the malpractice claim against Defendant Carrillo.

Presently before the court are Motions to Dismiss the plaintiff's Amended Complaint filed by (1) Defendants Thomas Groblewski, Linda Farag, Emily Holmes, Elizabeth Stephanian, and Rebecca Lubelczyk (collectively, the "MPCH Defendants") (Docket No. 81); (2) Defendant Carrillo (Docket No. 100); (3) Defendants Julie Ireland and Bart Nelson (Docket No. 144); and (4) Defendant Geraldine Somers, MD (Docket No. 155).  Because the medical malpractice claim against Dr. Carrillo is still pending before the Medical Malpractice Tribunal, Defendant Carrillo has only moved to dismiss the plaintiff's claim of deliberate indifference against her.  For the reasons set forth below, this court recommends to the District Judge to whom this case is assigned that Defendant Carrillo's Motion to Dismiss the deliberate indifference claim (Docket No. 100) be ALLOWED, Defendants Ireland and Nelson's Motion to Dismiss (Docket No. 144) be DENIED, Defendant Somers's Motion to Dismiss (Docket No. 155) be DENIED, and the MPCH Defendants' Motion to Dismiss (Docket No. 81) be ALLOWED IN PART and DENIED IN PART. Specifically, the MPCH Defendants' Motion should be allowed as to the medical malpractice claim against Defendant Farag, but otherwise denied.

## I.   STATEMENT OF FACTS

The facts are set forth as described in the Amended Complaint.  Because this case is before the court on Motions to Dismiss, the court takes as true all well-pleaded allegations in

the Amended Complaint and draws all reasonable inferences in DeLong's favor.  See Morales-Tanon v. P.R. Elec. Power Auth., 524 F.3d 15, 17 (1st Cir. 2008).

During the events giving rise to this civil action, DeLong was serving a sentence at the Souza Baranowski Correctional Center ("SBCC").  He was later moved to the Old Colony Correctional Center ("OCCC"), where he is presently incarcerated.  On September 7, 2014,[1] while using a weight machine at the SBCC gym, DeLong was injured when a cable snapped, causing the weight bar to fall on his knee.  Am. Compl. ¶¶ 18, 19.  DeLong promptly notified Department of Correction staff of the incident, and indicated that he was experiencing extreme pain in his knee as a result.  Id. ¶ 20.  DeLong was seen by medical staff that day and was told that he would see Bart Nelson, a nurse practitioner ("NP") at SBCC, in the morning.  Id. ¶¶ 5, 21.  Despite what he was told, DeLong was not seen by Defendant Nelson the following day or for several weeks following the accident.  Id. ¶¶ 22, 38.  On September 18, 2014, having not received any follow-up from medical staff, DeLong submitted a sick call slip, requesting to be seen by medical staff for his knee pain.  Id. ¶ 22.  Receiving no response, he submitted a second sick call slip on September 23, 2014, and was seen by a nurse that day.  Id. ¶¶ 24, 25.  The nurse told him that he would be referred to NP Nelson.  Id. ¶ 25.

## Delay in Receiving Medical Treatment

On September 25, 2014, DeLong saw Defendant Ireland, a registered nurse ("RN") and the Health Services Administrator at SBCC.  Id. ¶¶ 7, 21.  DeLong showed her his swollen knee.  Id. ¶ 27.  Defendant Ireland told DeLong that she would refer him to NP Nelson.  Id. ¶ 28.

---

[1] DeLong describes most dates in the Amended Complaint as "on or about."  For convenience, the court refers only to the date provided.

On October 5, 2014, DeLong spoke to an unidentified nurse who told DeLong that he would give DeLong's sick call slip directly to NP Nelson.  Id. ¶ 29.  The following day, on October 6, 2014, Sgt. Thomas Tocci observed DeLong's swollen knee and informed DeLong that he would speak with medical staff to see what they could do about the injury.  Id. ¶ 30.

On October 9, 2014, DeLong spoke to Superintendent Bruce Gelb about his knee injury and the refusal of medical staff to treat him.  Id. ¶¶ 31, 32.  Superintendent Gelb escorted DeLong to see RN Ireland.  Id. ¶ 33.  Ireland allegedly stated that she knew nothing of DeLong's injury, despite previously seeing his injury in September and promising to refer him to NP Nelson.  Id. ¶¶ 27-28, 33.  Defendant Ireland then told the plaintiff that she would place him on the list to see NP Nelson.  Id. ¶ 33.

On October 13, 2014, a family member of DeLong who was concerned about his condition called Deputy Superintendent Mike Rodriguez to request that DeLong receive medical care.  Id. ¶ 34.  The following day, DeLong was seen by a nurse and again told he would be referred to NP Nelson.  Id. ¶ 35.  On October 17, 2019, DeLong contacted Deputy Superintendent Rodriguez himself.  Id. ¶¶ 36-37.  Rodriguez told DeLong that he would speak to RN Ireland about the lack of medical treatment.  Id. ¶ 37.

On October 22, 2014, DeLong was finally seen by Defendant Nelson.  Id. ¶ 38.  Nelson ordered pain medication, an immediate x-ray, and an on-site consultation with an orthopedic doctor.  Id. ¶ 39.  DeLong states that the x-ray showed degenerative changes in his injured knee and a narrowing of the joint space.  Id. ¶ 40.

Over a month later, on November 28, 2019, a correctional officer informed DeLong that NP Nelson refused to see him, despite the fact that DeLong was on the list to be seen by

Nelson.  Id. ¶ 41.  Again, on December 2, 2014, DeLong was on the list to be seen by NP Nelson, but was denied the opportunity to see him.  Id. ¶ 42.  On December 4, 2014, DeLong completed a staff access pass concerning the lack of treatment.  Id. ¶ 43.  On December 5, 2014, DeLong was again on the list to see NP Nelson for a follow-up visit, but was nonetheless denied the ability to see him.  Id. ¶ 44.

On December 8, 2014, DeLong was seen by Dr. Geraldine Somers for a chronic care visit. Id. ¶ 45.  DeLong explained to Defendant Somers that he was experiencing extreme pain in his injured knee.  Id. ¶ 46.  Dr. Somers noticed a deformity to DeLong's knee, but never inquired about treatment on DeLong's behalf.  Id.

On December 13, 2014, DeLong received documentation from Superintendent Vidal Osvaldo about the lack of medical treatment DeLong had received up to that point.  Id. ¶ 47. Defendant Osvaldo informed DeLong that he must go through the regular medical process to receive treatment.  See id. ¶ 48.

### Delay in Receiving Surgery

On January 10, 2015, DeLong received a letter from Defendant Ireland stating that an "on-site ortho referral is pending."  Id. ¶ 49.  One month later, DeLong went to an appointment with an orthopedic doctor, who recommended surgery and a follow-up appointment with an orthopedist at Lemuel Shattuck Hospital ("LSH").  Id. ¶ 50.  However, on February 26, 2015, Aaron Bigio, RN cancelled the orthopedic doctor's order for surgery due to DeLong's "perceived activity level" at the prison.  Id. ¶ 51.  Defendant Bigio allegedly never observed such activity, but relied instead on the observations of a correction officer who was a subordinate of Defendants Rodriguez and Osvaldo.  Id.

On March 10, 2015, Al Troisi of Prisoner Legal Services ("PLS"), a not-for-profit legal services corporation, sent a letter on DeLong's behalf to Defendants Somers, Collins and Groblewski requesting that the prison and medical officials provide DeLong with medication to control his serious pain, as well as a referral to LSH for an orthopedic consultation.  Id. ¶¶ 52, 53.

On March 30, 2015, DeLong informed RN Ireland that he was being denied the LSH consult and surgery that had been recommended to treat his knee injury.  Id. ¶ 54.  On April 10, 2015, Defendant Ireland responded to DeLong, stating that a treatment plan had been implemented and that surgery would not be given to him at this time.  Id. ¶ 55.

On April 21, 2015, DeLong appealed the denial of surgery and/or orthopedic consultation to Linda Farag, a grievance coordinator for the Massachusetts Partnership of Correctional Health ("MPCH").[2]  Id. ¶¶ 8, 56.  Defendant Farag denied DeLong's appeal, but failed to specifically address the need for surgery or an orthopedic referral.  Id. ¶ 57.

On May 7, 2015, DeLong was transferred to OCCC.  Id. ¶ 58.  Shortly thereafter, he was seen by Dr. N.K. Bhagovon.  Id. ¶ 59.  Dr. Bhagovon placed a consult to an orthopedic doctor.  Id.  The same day, DeLong received a letter from Stephanie Collins, the Assistant Deputy Commissioner of Clinical Services for the Massachusetts Department of Correction.  Id. ¶¶ 15, 60.  The letter informed DeLong that the Department of Correction's Utilization Management Team ("UMT"), which DeLong believes consisted of Defendants Nelson, Somers, Ireland,

---

[2] MPCH is a private company that served as an independent contractor for the Massachusetts Department of Correction to provide medical care to state inmates during the relevant period.  (See Docket No. 82 at 1 n.1).

Groblewski, Collins and Lubelczyk, denied his referral to an orthopedic doctor.  Id. ¶¶ 15a, 62.
The referral was purportedly denied on the basis of DeLong's activity level.  Id. ¶ 63.

On June 3, 2015, DeLong received a letter from Defendant Stephanian stating that an
orthopedic consultation was pending.  Id. ¶ 66.  On July 29, 2015, DeLong was seen by an
orthopedic doctor at Bridgewater State Hospital.  Id. ¶ 67.

Two months later, DeLong was seen by NP Carol Lockwood for his knee pain and she
recommended that DeLong be seen by an orthopedic doctor.  Id. ¶¶ 68, 69.  This request was
denied.  Id. ¶ 70.  DeLong again requested that he be sent to the on-site orthopedic doctor.  Id.
On October 14, 2015, NP Lockwood submitted a second request for DeLong to be seen by an
orthopedic doctor at LSH.  Id. ¶ 71.

On October 20, 2015, DeLong was again seen by an orthopedic doctor at Bridgewater
State Hospital, who recommended knee surgery at LSH.  Id. ¶¶ 72, 73.  The doctor's request for
knee surgery was denied, purportedly by UMT.  Id. ¶ 74.  NP Lockwood placed another referral
for DeLong to see an orthopedic doctor at LSH and informed DeLong of how to file an appeal.
Id. ¶ 75.  DeLong subsequently filed an appeal (presumably with Defendant Farag) of the
decision to deny knee surgery.  Id. ¶ 76.

On December 8, 2015, DeLong saw Dr. Carrillo, an orthopedic surgeon at LSH.  Id.
¶¶ 15b, 77.  After examining DeLong, Defendant Carrillo concluded that DeLong would benefit
from arthroscopy surgery.  Id. ¶ 78.  Defendant Carrillo told DeLong that surgery would be
scheduled as soon as it was approved by MPCH.  Id. ¶ 79.

On February 2, 2016, DeLong was brought to LSH for surgery.  Id. ¶ 80.  The surgery
consisted of a "left knee [arthroscopy] and a chondroplasty of the medial femoral condyle with

microfractures and remodeling of the medial meniscus." Id. ¶ 81.  The medical discharge

instructions from LSH provided for Percocet every four to six hours.  Id. ¶ 83.

### Treatment after Surgery

Upon his return from LSH, DeLong was placed in OCCC's Health Services Unit ("HSU").

See id. ¶¶ 82, 102.  The HSU intake nurse informed DeLong that he would not be given

Percocet.  Id. ¶ 84.  Defendant Tran, a doctor at OCCC, changed the discharge orders to

prescribe Toradol every 8 hours instead of Percocet.  Id. ¶¶ 11, 86.

The first night after surgery, DeLong was in a great deal of pain and was given Ibuprofen.

Id. ¶ 87.  One hour later, DeLong asked a correction officer to see a duty nurse concerning his

pain, but he was told that the nurse refused to see him.  Id. ¶ 88.  The next morning, DeLong

was still in extreme pain and asked a passing nurse for help.  See id. ¶ 89.  The nurse allegedly

laughed at DeLong and kept walking.  Id.

The day after surgery, DeLong advised nursing supervisor Patti Davenport-Mello, who

appeared at the unit door, that his knee was swollen and that that he was in extreme pain.  Id.

¶ 90.  He asked to see a doctor for stronger pain medication.  Id.  The nursing supervisor

informed DeLong that he would be seen "like everybody else[,] when Defendant Tran feels like

seeing him."  Id. ¶ 91.  Later that morning, RN Stephanian examined DeLong's knee, even

though it was outside the scope of her practice.  Id. ¶ 92.  DeLong informed Defendant

Stephanian of the level of pain he was experiencing and that he needed stronger pain medica-

tion than Ibuprofen.  Id. ¶ 93.  Defendant Stephanian administered a shot of Toradol and told

DeLong that he would not receive pain medication other than Ibuprofen or Acetaminophen.  Id.

¶ 94.  The Toradol reduced DeLong's knee pain slightly, but he continued to experience extreme pain.  Id. ¶ 95.

At noon, DeLong was seen by Dr. Tran.  Id. ¶ 96.  Defendant Tran did not order more pain medication or seek to have DeLong transported to a hospital.  Id. ¶ 97.  When DeLong reported that his pain was a 10 on a scale of 10, a medical staff member told him that it was good to feel pain.  Id. ¶ 98.

The following day, on February 4, 2016, DeLong was again examined by RN Stephanian. Id. ¶ 99.  She refused to give DeLong any pain medication, telling him that Percocet is not given to inmates at OCCC and that "he should get used to it."  Id. ¶ 100.  DeLong has since discovered that several inmates at OCCC receive Percocet.  Id. ¶ 101.  DeLong asserts that Defendants Stephanian and Tran purposefully withheld Percocet to cause him pain.  Id.

Despite the fact that DeLong was immobile and in extreme pain, he was moved to a unit outside the HSU sometime between February 5, 2016, and February 10, 2016.  Id. ¶ 102.  On February 11, 2016, DeLong was called to the HSU and his crutches were taken away from him by order of Defendant Tran.  Id.¶ 103.

On February 23, 2016, DeLong was transported to LSH for a follow-up appointment with Andrea Tortolano, an orthopedic physician's assistant ("PA").  Id. ¶ 104.  PA Tortolano reported that DeLong still had fluid in his knee and noted that DeLong's crutches should not have been taken away from him, as per Dr. Carrillo's instructions.  Id. ¶¶ 105-107.  PA Tortolano provided DeLong with crutches and told him to remain on the crutches until Dr. Carrillo ordered other-wise.  Id.¶ 108.  She scheduled a physical therapy appointment at LSH for DeLong, since he had

yet to see a physical therapist at OCCC, and further suggested that DeLong receive a Synvisc injection into his knee at his next appointment. Id. ¶¶ 109-10.

On March 1, 2016, DeLong received a letter from Defendant Collins, stating that he had not been given Percocet because "the provider believes it was contraindicated." Id. ¶ 111.

### Failure to Receive a Synvisc Injection

On March 22, 2016, DeLong was transported to LSH for a follow-up appointment with PA Tortolano. Id. ¶ 112. At that time, DeLong informed her that he had been approved for a Synvisc injection into his knee. Id. ¶ 113. However, when PA Tortolano contacted OCCC, she was advised that DeLong had not been approved for the Synvisc injection. Id. ¶ 114.

Upon returning to OCCC, DeLong notified Emily Holmes, the Health Services Administrator at OCCC, that he was denied the Synvisc injection. Id. ¶¶ 12, 116. More than two weeks later, DeLong received a written response from Defendant Holmes stating that, although NP Lockwood had requested the injection per the instructions of LSH medical staff, the injection was nevertheless denied "due to the lack of clinical evidence supporting its [efficacy]." Id. ¶ 117. DeLong states that the decision to deny the Synvisc injection was made by Defendants Tran, Groblewski, Holmes and Collins. Id. ¶ 118.

On or about April 14, 2016, DeLong appealed the decision to deny him a Synvisc injection to Defendant Farag. Id. ¶ 119. Defendant Farag denied DeLong's appeal and informed him that a Synvisc injection was not indicated. Id. ¶ 120. Defendant Farag made this determination without examining DeLong. Id.

At a follow-up appointment with Dr. Carrillo at LSH on August 30, 2016, Dr. Carrillo strongly recommended the Synvisc injection. Id. ¶¶ 122-23. She explained that it could help

with DeLong's condition and potentially prevent the need for immediate total knee replacement surgery.  Id. ¶ 124.  Despite this, Defendant Holmes subsequently notified DeLong that, after a utilization review, it was determined that the Synvisc injection was not medically necessary.  Id. ¶ 125.

On September 21, 2016, Dr. Tran examined DeLong and placed an order for a Synvisc injection to be administered at LSH.  Id. ¶ 126.  Defendant Tran's request was denied, without any examination from any other doctor.  Id. ¶ 127.

Almost one year later, DeLong returned to LSH for an appointment with Dr. Carrillo.  Id. ¶¶ 128-29.  Defendant Carrillo advised DeLong that, due to the failure to administer a Synvisc injection, he would now need a total knee replacement.  Id. ¶ 129.  Defendant Carrillo stated that if the injection had been given to DeLong when first requested, he would not require a total knee replacement.  Id. ¶ 130.

### Foreign Objects in Knee

Several months after DeLong's knee surgery in 2016, DeLong informed Dr. Carrillo that he was experiencing "lateral compartment pain" that felt like a stabbing pain.  Id. ¶ 131a.  Over one year later, on August 17, 2017, DeLong was sent to LSH for x-rays of both knees.  Id. ¶ 131b.  Dr. Carrillo reviewed the x-rays and informed DeLong that his "knee was bad" but that "the surgery had gone as expected."  Id.  Defendant Carrillo stated that she saw no complications with the surgery but also noted "loose bodies" in his knee.  Id.  The diagnostic imaging report noted that "surgical clips" had been found in the left knee.  Id. ¶ 131c.

On January 19, 2018, x-rays were taken at OCCC of DeLong's left knee.  Id. ¶ 131d.  The following month, on February 9, 2018, DeLong met with Despina Kiely, his primary care

provider ("PCP"), who observed that there were three clips visible on the x-ray above his left knee.  Id. ¶¶ 131e, 131f.

Dr. Carrillo separately reviewed the x-rays and concluded that what she had previously believed to be surgical clips was actually a piece of a surgical drill that had broken off during the surgery.  Id. ¶ 131g.  Dr. Carrillo had never previously mentioned the existence of a drill piece, despite seeing DeLong multiple times.  Id. ¶ 131h.  DeLong contends that Defendant Carrillo requested DeLong undergo additional surgery in an attempt to "cover-up" the errors that were caused in the original surgery.  Id. ¶ 131i.

Al Troisi of PLS subsequently sent a letter on DeLong's behalf requesting that he not be brought back to LSH.  Id. ¶¶ 131j, 131k.  Defendant Collins informed Troisi that DeLong would be sent to Defendant Carrillo at LSH to have the foreign objects removed from his knee.  Id. ¶ 131k.

On March 5, 2018, DeLong was seen by Dr. Lubelczyk about the foreign objects in his knee.  Id. ¶ 131l.  Defendant Lubelczyk informed DeLong that the previous finding of three foreign objects in his knee was incorrect and that, in fact, there was only one foreign object in his knee.  Id. ¶ 131m.  Another x-ray was performed, which revealed one metallic foreign body in DeLong's knee measuring 1.4 cm in length.  Id. ¶¶ 131n, 131o.

Dr. Lubelczyk recommended stronger pain medication for DeLong, but only if he consented to surgery at LSH to remove the foreign objects from his knee.  Id. ¶ 131p.  DeLong would only agree to surgery at Boston Medical Center ("BMC"), where he asserts that evidence of the defendants' negligence could be preserved for the instant lawsuit.  Id. ¶ 131q.

On March 14, 2018, DeLong met with PCP Kiely about obtaining a referral to BMC.  Id. ¶ 131r.  PCP Kiely wrote a priority referral to BMC for DeLong to see an orthopedic doctor about the foreign objects in his knee.  Id. ¶ 131w.  The referral mentioned that DeLong "has to repeatedly request clarification [which] has led to [a] break in the patient-provider relationship[ ]" between DeLong and LSH.  Id. ¶ 131x.  PCP Kiely noted that DeLong had been agreeable to the prior plan of care at LSH and had never voiced concerns regarding seeking medical care elsewhere until the discovery of foreign objects in his knee.  Id.  The PCP also told DeLong that she would write a referral for physical therapy to see whether it would be possible to relieve DeLong's knee pain without medication.  Id. ¶ 131aa.

DeLong also met with, and explained the situation to, Dr. Lubelczyk.  Id. ¶¶ 131s, 131t.  Defendant Lubelczyk informed DeLong that she would take the information under advisement while deciding whether to allow DeLong to go to BMC.  Id. ¶ 131u.  On March 26, 2018, the UMT denied the priority referral to BMC.  Id. ¶ 131y.

On March 21, 2019, Defendant Holmes informed DeLong that he would not be allowed to go to BMC for his surgery, but indicated that she was looking into other hospitals.  Id. ¶ 131z.  She also stated that, per Defendant Lubelczyk, DeLong would not be permitted to receive any additional pain medication unless he agreed to go to a hospital for the surgery.  Id.

On March 26, 2018, DeLong was seen by Dr. Lubelczyk, who explained that she and Defendant Groblewski determined that "there had been no action that rendered [LSH] unable to provide [total knee replacement]."  Id. ¶ 131ab.  Defendant Lubelczyk also informed DeLong that he would not be given additional medication unless he agreed to have knee replacement surgery at LSH.  Id. ¶ 131ac.

13

On March 29, 2018, DeLong submitted a grievance to Defendant Holmes concerning the

denial of pain medication and the denial of his ability to be treated at a hospital other than LSH.

Id. ¶ 131ad.  Defendant Holmes responded by stating that Dr. Lubelczyk had informed her that

"any change to [the] pain medication regimen would not be authorized without a

predetermined time frame" as to when total knee replacement surgery would be completed.

Id. ¶ 131ae.

In May or June 2018, DeLong's knee gave out while he was taking a shower.  Id. ¶ 131af.

He fell and subsequently developed a large bruise, as well as severe pain.  Id. ¶ 131af.  The

Amended Complaint states that, to date, the defendants have no future plans to address

DeLong's knee injury.  Id. ¶ 131ag.  In a motion filing submitted to the court on July 25, 2019,

however, DeLong indicated that he has recently been approved to have knee surgery at St.

Elizabeth's Hospital.  (See Docket No. 187 at 1).

## II.  <u>STANDARD OF REVIEW</u>

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court

"must assume the truth of all well-plead[ed] facts and give the plaintiff the benefit of all

reasonable inferences therefrom."  Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st

Cir. 2007) (citation omitted).  Where, as here, the plaintiff is proceeding *pro se*, the court must

construe his allegations liberally.  See Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct. 285, 292, 50

L. Ed. 2d 251 (1976) (a *pro se* complaint, however inartfully pleaded, must be liberally

construed).  Dismissal is only appropriate if the complaint, so viewed, fails to allege a "plausible

entitlement to relief."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 95 (1st Cir. 2007)

(internal quotations omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 559, 127 S. Ct. 1955, 1967, 167 L. Ed. 2d 929 (2007)).

"In evaluating whether a complaint states a plausible claim, we 'perform [a] two-step analysis.'" Saldivar v. Racine, 818 F.3d 14, 18 (1st Cir. 2016) (quoting Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015)). "First, the court must distinguish the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)." Garcia-Catalan v. United States, 734 F.3d 100, 103 (1st Cir. 2013) (internal quotations and citation omitted). "Second, the court must determine whether the factual allegations are sufficient to support the reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal quotations and citation omitted). This second step requires the reviewing court to "draw on its judicial experience and common sense." Id. (internal quotations and citation omitted). "If the factual allegations in the complaint are too meager, vague, or conclusory to remove the possibility of relief from the realm of mere conjecture, the complaint is open to dismissal." Morales-Cruz v. Univ. of P.R., 676 F.3d 220, 224 (1st Cir. 2012) (internal quotations and citation omitted).

### III.  DISCUSSION

Considering the totality of DeLong's allegations, the court can reasonably infer that DeLong contends that he suffered from a serious knee injury and that treatment of his condition was repeatedly delayed at both SBCC and OCCC.  Further, DeLong alleges that, on numerous occasions, he made significant efforts to inform the defendants of his pain and treatment needs, only to have the suggestions and orders of various medical providers and specialists changed, denied, or ignored.

Defendants Groblewski, Farag, Holmes, Stephanian, Lubelczyk, Carrillo, Ireland, Nelson and Somers have all moved to dismiss the claims asserted against them, pursuant to Fed. R. Civ. P. 12(b)(6).  The defendants contend that the Amended Complaint fails to plead sufficient facts to establish a plausible claim of deliberate indifference under §1983, and that the defendants are entitled to qualified immunity in any event.  They also contend that DeLong has failed to adequately plead his state law claims of medical malpractice.

### A.   Eighth Amendment Deliberate Indifference Claims

The Eighth Amendment imposes duties on prison officials to provide "humane conditions of confinement." Farmer v. Brennan, 511 U.S. 825, 832, 114 S. Ct. 1970, 1976, 128 L. Ed. 2d 811 (1994).  "Government officials violate the Eighth Amendment if they display 'deliberate indifference' to a prisoner's 'serious medical needs.'" Miranda-Rivera v. Toledo-Davila, 813 F.3d 64, 74 (1st Cir. 2016) (citation omitted).  To assert a viable Eighth Amendment claim, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle, 429 U.S. at 106, 97 S. Ct. at 292.

To prevail on a claim for deliberate indifference, "a plaintiff must satisfy both a subjective and objective inquiry."  Nolet v. Armstrong, 197 F. Supp. 3d 298, 305 (D. Mass. 2016) (internal quotations and citations omitted).  The plaintiff must show "first, that prison officials possessed a sufficiently culpable state of mind, namely one of 'deliberate indifference' to an inmate's health or safety, and second, that the deprivation alleged was objectively, sufficiently serious." Leavitt v. Corr. Med. Servs., Inc., 645 F.3d 484, 497 (1st Cir. 2011) (internal quotations and citation omitted).

"For purposes of [the] subjective prong, deliberate indifference 'defines a narrow band of conduct,' and requires evidence that the failure in treatment was purposeful." Kosilek v. Spencer, 774 F.3d 63, 83 (1st Cir. 2014) (en banc) (citation omitted). "This prong does not impose upon prison administrators a duty to provide care that is ideal, or of the prisoner's choosing." Id. at 82. Courts "have consistently refused to create constitutional claims out of disagreements between prisoners and doctors about the proper course of a prisoner's medical treatment, or to conclude that simple medical malpractice rises to the level of cruel and unusual punishment." Watson v. Caton, 984 F. 2d 537, 540 (1st Cir. 1993). Thus, "allegations [that] simply reflect a disagreement on the appropriate course of treatment . . . fall[ ] short of alleging a constitutional violation." Ferranti v. Moran, 618 F.2d 888, 891 (1st Cir. 1980). Additionally, evidence that shows "substandard care, malpractice, negligence, [or] inadvertent failure to provide care . . . [is] insufficient to prove a constitutional violation." Ruiz-Rosa v. Rullan, 485 F.3d 150, 156 (1st Cir. 2007). "Rather, the Constitution proscribes care that is so inadequate as to shock the conscience." Kosilek, 774 F.3d at 83 (internal quotations and citations omitted). Accordingly, deliberate indifference "may be shown by the denial of needed care as punishment and by decisions about medical care made recklessly with actual knowledge of impending harm, easily preventable." Ruiz-Rosa, 485 F.3d at 156 (internal quotations and citation omitted).

### Existence of Serious Medical Need

As detailed above, in order to prevail on a claim for deliberate indifference, a plaintiff must demonstrate that he had a serious medical need. A serious medical need is one "that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a

17

lay person would easily recognize the necessity for a doctor's attention."  Leite v. Bergeron, 911

F.3d 47, 52 (1st Cir. 2018).  The plaintiff has plainly advanced allegations that plausibly assert

the existence of a serious medical need, beginning at the time of the plaintiff's knee injury in

2014.  The relevant inquiry is thus whether the defendants acted with deliberate indifference to

this medical need.

### Eighth Amendment Claims Against Members of Utilization Management Team

Defendants Nelson, Somers, Ireland, Groblewski, Collins, and Lubelczyk were all

allegedly part of the UMT that repeatedly denied the plaintiff access to courses of treatment

recommended by the plaintiff's physicians.  Specifically, the UMT denied the plaintiff's referral

to an orthopedic doctor for his knee injury and then later denied his doctor's request that he

receive knee surgery.  According to the Amended Complaint, throughout this period, the

plaintiff made repeated attempts to notify medical staff of his condition and his need for

treatment.  Despite this, the plaintiff was made to wait seventeen months before finally

receiving surgery to treat his knee injury.  As pled, these allegations are sufficient to make out a

claim of deliberate indifference against the defendants who were part of the UMT.  See

Sepulveda v. UMass Corr. Health, Care, 160 F. Supp. 3d 371, 386 (D. Mass. 2016) (concluding

that prisoner had set forth plausible deliberate indifference claim where he alleged two-month

delay in providing pain medication and several month delay in performing necessary surgery);

Duncan v. Duckworth, 644 F.2d 653, 654 (7th Cir. 1981) ("the failure to promptly schedule

surgery, once the need for it was recognized and in the face of [the plaintiff's] repeated

complaints of severe pain, raises serious questions regarding the prison hospital officials'

concern for their patient").  Thus, Defendants Ireland and Nelson's Motion to Dismiss should be

DENIED as to the deliberate indifference claims, Defendant Somers's Motion to Dismiss should be DENIED as to the deliberate indifference claim, and the MPCH Defendants' Motion to Dismiss should be DENIED as to the deliberate indifference claims against Defendants Groblewski and Lubelczyk.

### Eighth Amendment Claims Against Defendant Holmes

DeLong alleges that Defendant Holmes was among the defendants to deny DeLong's request for a Synvisc injection, despite the fact that it would have obviated the need for total knee replacement surgery later. The MPCH Defendants characterize Defendant Holmes as merely a "messenger" who had no direct role in the plaintiff's medical treatment. While the majority of the plaintiff's allegations against Defendant Holmes pertain to messages that she relayed on behalf of other defendants, the plaintiff does allege that Defendant Holmes was one of the individuals who made the decision to deny him the Synvisc injection. Am. Compl. ¶ 118. This decision was made despite the requests of Dr. Carrillo, PA Tortolano, and (later) Dr. Tran to administer the injection. Given the allegations that the refusal to provide the injection occurred in the midst of DeLong's deteriorating knee condition and ongoing extreme knee pain, the plaintiff has sufficiently alleged a claim for deliberate indifference. See Leite, 911 F.3d at 52-53. It is therefore recommended that the MPCH Defendants' Motion to Dismiss be DENIED as to Defendant Holmes on the deliberate indifference claim.

### Eighth Amendment Claims Against Defendant Stephanian

DeLong contends that Defendant Stephanian was deliberately indifferent to his severe pain upon his return to OCCC after the knee surgery. DeLong states that Defendant Stephanian falsely told him that Percocet was not given to inmates at OCCC, while purposefully withholding

Percocet to cause him pain.  As an initial matter, the MPCH Defendants argue that Defendant Stephanian was not authorized to give the plaintiff Percocet, and thus could not have acted with deliberate indifference for failing to do something outside of her authority.  However, this argument relies on assertions about the scope of Stephanian's authority that go beyond what has been alleged in the Amended Complaint.  Accordingly, it does not warrant dismissal of the claim.  See Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) ("The fate of a motion to dismiss under Rule 12(b)(6) ordinarily depends on the allegations contained within the four corners of the plaintiff's complaint.")

The defendants also contend that the allegations against Stephanian merely pertain to a disagreement about the appropriate course of treatment, and cannot form the basis of a claim for deliberate indifference.  This court disagrees.  The Amended Complaint states that, two days after DeLong's knee surgery, Stephanian refused to provide "any pain medication that [would] assist with his pain management."  Am. Comp. ¶ 99.  In light of the plaintiff's allegations that he was in extreme pain, that Percocet had been specifically prescribed by LSH staff, and that Percocet had been made available to other inmates at OCCC, the Amended Complaint plausibly alleges that Defendant Stephanian acted with deliberate indifference by refusing to respond to the plaintiff's complaints.  See Nolet, 197 F. Supp. 3d at 306 (allegation that plaintiff was taken off pain medication, despite still being in pain, sufficient to state a claim for deliberate indifference).  It is therefore recommended that the MPCH Defendants' Motion to Dismiss be DENIED as to Defendant Stephanian on the deliberate indifference claim.

**Eighth Amendment Claims Against Defendant Farag**

According to DeLong, Linda Farag was the Grievance Coordinator for MPCH.  In 2015, DeLong filed two appeals concerning the denial of surgery and referral to an outside orthopedic doctor, which had both been recommended by numerous healthcare providers.  In 2016, DeLong filed an appeal of the denial of the Synvisc injection that had also been recommended by multiple providers.

The MPCH Defendants argue that Defendant Farag did not provide any direct medical care and that she denied DeLong's appeal concerning the Synvisc injection because it was "not indicated."  The MPCH Defendants thus contend that DeLong cannot claim that Farag knew that the requested treatments were an obvious step or that she intended to inflict pain.

Generally, a prison official's review of an inmate's administrative appeal cannot serve as the basis for liability under Section 1983 because "inmates lack a separate constitutional entitlement to a specific prison grievance procedure."  Ramirez v. Galaza, 334 F.3d 850, 860 (9th Cir. 2003) (analyzing 1983 claim in context of due process challenge to prisoner's disciplinary sentence).  However, "an individual who denies an inmate appeal and who had the authority and opportunity to prevent an ongoing constitutional violation could potentially be subject to liability if the individual knew about an existing or impending violation and failed to prevent it."  Grant v. Cate, No. 2:14-cv-1867 MCE KJN P, 2016 WL 7116714, at *8 (E.D. Cal. Dec. 7, 2016); see Jett v. Penner, 439 F.3d 1091, 1098 (9th Cir. 2006) ("prison administrators . . . are liable for deliberate indifference when they knowingly fail to respond to an inmate's requests for help").  But see Drewry v. Correct Care Sols., No. 1:14-CV-00392-GZS, 2015 WL 5693042, at *9 (D. Me. Sept. 28, 2015) and cases cited (explaining that a defendant who merely reviews

grievances, but has no authority to influence the medical care of a plaintiff cannot be held liable for deliberate indifference).  Here, DeLong has plausibly alleged that Defendant Farag was aware that DeLong was being denied treatment that had been recommended by medical specialists, that Farag had the authority to influence his medical care by deciding his appeals, and that Farag nonetheless chose to deny those appeals.  Based upon these contentions and the facts alleged, the MPCH Defendants' Motion to Dismiss should be DENIED as to Defendant Farag's deliberate indifference claim.

**Eighth Amendment Claims Against Defendant Carrillo**

Unlike the allegations against the other defendants, the allegations against Defendant Carrillo center on the knee surgery that she performed on DeLong in February 2016.  DeLong alleges that Carrillo left foreign objects in his knee, and failed to discover the mistake until long after the surgery, despite his complaint of stabbing pain.

"[S]ubpar care amounting to negligence or even malpractice does not give rise to a constitutional claim."  Leavitt, 645 F.3d at 497.  However, "decisions about medical care made recklessly with actual knowledge of impending harm, easily preventable[,]" may constitute deliberate indifference.  Id. (internal quotations and citations omitted).  Under this standard, Carrillo's negligent performance of the surgery, while unfortunate, does not rise to the level of deliberate indifference.  It is a somewhat closer question as to whether Carrillo's failure to identify the "loose bodies" in DeLong's knee as remnants of a drill, necessitating follow-up surgery, plausibly amounts to reckless conduct.  The Amended Complaint indicates that DeLong notified Carrillo that he was experiencing stabbing pain a few months after the surgery, and Carrillo herself observed loose bodies on an x-ray of the plaintiff's knee in August 2017.  Taken

as a whole, however, these allegations amount to a claim of negligence rather than deliberate indifference.  DeLong does not appear to allege that Carrillo ignored his complaints, or ignored the results of the 2017 x-ray.  See Bravo v. Loor-Tuarez, 727 F. App'x 572, 576 (11th Cir. 2018) ("[plaintiff's] allegations that he told his doctors he felt something inside of him, and that they disregarded his complaints even though his condition was deteriorating, state a claim for relief that is plausible on its face.").  Rather, she failed to understand their significance.  See Farmer, 511 U.S. at 826, 114 S. Ct. at 1973 ("the failure to alleviate a significant risk that an official should have perceived but did not, while no cause for commendation, cannot be condemned as the infliction of punishment").  Accordingly, the plaintiff has failed to plausibly set forth a claim of deliberate indifference against Dr. Carrillo, and her Motion to Dismiss the Eighth Amendment claim should be GRANTED.  The court notes, however, that because Dr. Carrillo has only moved to dismiss the plaintiff's deliberate indifference claim, the plaintiff's medical malpractice claim, which remains pending before the Medical Malpractice Tribunal, is not subject to dismissal at this stage.

###### B.   Entitlement to Qualified Immunity

The defendants have not sustained their burden to show that they are entitled to qualified immunity at this stage of the proceedings.  Qualified immunity prevents suits against public officials, acting in their individual capacities, "unless (1) the facts alleged or shown by the plaintiff make out a violation of a constitutional right and (2) such right was clearly established at the time of the defendant[s'] alleged violation[s]."  Feliciano-Hernandez v. Pereira-Castillo, 663 F.3d 527, 532 (1st Cir. 2011) (alterations in original) (internal quotations and citations omitted).  As discussed, DeLong has adequately pled Eighth Amendment violations.

23

Additionally, DeLong's theory of liability is not so novel that the court can determine, based on the pleadings alone, that his rights were not "clearly established" or that a reasonable person would not have been aware of said rights.  At this point, the issue of qualified immunity turns on unresolved questions of fact.

### C.    State Medical Malpractice Claims

Finally, the defendants allege that the medical malpractice claims must be dismissed. Under Massachusetts law, a claim of medical malpractice requires that "a physician-patient relationship existed between the physician and the injured party, that the physician breached his or her duty of care, and that the breach was the proximate cause of the injury." Mitchell v. United States, 141 F.3d 8, 13 (1st Cir. 1998).  The applicable duty of care is based upon "the standard of care and skill of the average practitioner of the medical specialty in question, taking into account the advances in [the medical] profession." Id.

### Existence of Physician-Patient Relationship

Defendants Groblewski, Farag, Holmes, and Ireland each argue that they did not have a physician-patient relationship with the plaintiff.  "The essence of the doctor-patient relation-ship is the undertaking by a physician to diagnose and/or treat the person being diagnosed or treated with reasonable professional skill." Lambley v. Kameny, 43 Mass. App. Ct. 277, 283, 682 N.E.2d 907, 912 (1997).  "The acceptance or undertaking of treatment of a patient by a physician creates the relationship." Garcia v. City of Boston, 115 F. Supp. 2d 74, 78 (D. Mass. 2000), aff'd, 253 F.3d 147 (1st Cir. 2001).  Defendants Ireland and Groblewski were allegedly members of the UMT, which made assessments about the plaintiff's treatment needs and issued decisions about whether to permit requested courses of treatment.  At this stage in the

proceedings, DeLong's assertions that these individuals played such a role in his treatment as part of the UMT are sufficient to establish the existence of a healthcare provider-patient relationship.  Additionally, the plaintiff alleges that Defendant Holmes was one of the decisionmakers who refused to allow him to receive a Synvisc injection.  To the extent that Defendant Holmes made such medical decisions about the plaintiff's care, she may be held liable.  See generally Lambley, 43 Mass. App. Ct. at 285, 682 N.E.2d at 913 (existence of medical duty of care construed broadly to comport with practical reality of patient treatment).

As to Defendant Farag, however, the plaintiff has not made any allegations to establish a doctor-patient relationship.  Although the plaintiff presented grievances to Farag about the treatment he received from healthcare providers, Farag herself did not make medical decisions about the plaintiff's care.  Accordingly, this court recommends that the MPCH's Motion to Dismiss be ALLOWED as to the medical malpractice claims asserted against Defendant Farag.

### Breach of Duty of Care

In a medical malpractice action, a plaintiff must establish that the healthcare provider breached his or her duty of care.  Mitchell, 141 F.3d at 13.  "The relevant standard of care is whether the health-care professional has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession."  Nolet, 197 F. Supp. 3d at 305 (internal quotations and citation omitted).  The MPCH Defendants, as well as Defendants Somers, Ireland and Nelson, half-heartedly argue that the plaintiff has not sufficiently alleged that they breached their duty of care, or that any such breach proximately caused the plaintiff harm.  This court disagrees.

Construing the plaintiff's allegations liberally, DeLong has sufficiently alleged facts to make out a plausible claim that the defendants breached their duty to the plaintiff, proximately causing him harm. The plaintiff's allegations against the defendants who participated in the UMT and allegedly caused a seventeen-month delay in adequate treatment, as well as Defendant Holmes who helped to deny the Synvisc injection, set forth a plausible claim for a breach in duty. Additionally, Defendant Stephanian's alleged inadequate treatment of the plaintiff's pain could plausibly amount to a breach of duty. See id. at 306. The plaintiff has also adequately pleaded causation, alleging that the failure to timely approve his knee surgery caused him extreme pain, the failure to administer the Synvisc injection resulted in the need for a total knee replacement, and the failure to adequately manage his pain caused him extreme discomfort. Furthermore, issues of causation generally "consist[ ] of questions of fact reserved for the factfinder." Wooten v. Khan, C.A. No. 16-11642, 2017 WL 2468782, at *3 (D. Mass. June 7, 2017). Thus, at this stage in the litigation, the plaintiff has sufficiently pled both breach of duty and causation.

Accordingly, this court recommends that the MPCH Defendants' Motion to Dismiss be DENIED as to the medical malpractice claims against Defendants Stephanian, Lubelcyzk, Groblewski, and Holmes, that Defendant Somers's Motion to Dismiss be DENIED as to the medical malpractice claim against her, and that Defendant Ireland and Nelson's Motion to Dismiss be DENIED as to the medical malpractice claims against them.

### IV. <u>CONCLUSION</u>

For the foregoing reasons, this court recommends to the District Judge to whom this case is assigned that Defendant Carrillo's Motion to Dismiss the deliberate indifference claim

(Docket No. 100) be ALLOWED,[3] Defendants Ireland and Nelson's Motion to Dismiss (Docket

No. 144) be DENIED, Defendant Somers's Motion to Dismiss (Docket No. 155) be DENIED, and

the MPCH Defendants' Motion to Dismiss (Docket No. 81) be ALLOWED IN PART and DENIED IN

PART.  Specifically, the MPCH Defendants' Motion should be allowed as to the medical

malpractice claim against Defendant Farag, but otherwise denied.[4]

/ s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[3] As noted, because Dr. Carrillo has only moved to dismiss the plaintiff's deliberate indifference claim, the plaintiff's medical malpractice claim against Dr. Carrillo, which remains pending before the Medical Malpractice Tribunal, is not subject to dismissal at this stage.

[4] The parties are hereby advised that under the provisions of Fed. R. Civ. P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 14 days after being served with this Report and Recommendation.  The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections.  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir. 1988); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 604-05 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 153-54, 106 S. Ct. 466, 474, 88 L. Ed. 2d 435 (1985).  Accord Phinney v. Wentworth Douglas Hosp., 199 F.3d 1, 3-4 (1st Cir. 1999); Henley Drilling Co. v. McGee, 36 F.3d 143, 150-51 (1st Cir. 1994); Santiago v. Canon U.S.A., Inc., 138 F.3d 1, 4 (1st Cir. 1998).